SEAN P. REIS (No. 184044)
sreis@edelson.com
EDELSON MCGUIRE LLP
30021 Tomas Street, Suite 300
Rancho Santa Margarita, California 92688
Telephone: (949) 459-2124
Facsimile: (949) 459-2123

*Attorneys for Plaintiff Missaghi*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHAGHAYEGH MISSAGHI, individually and on behalf of a class of similarly situated individuals,<br><br>    Plaintiff,<br><br>v.<br><br>THE COCA-COLA COMPANY, a Georgia corporation,<br><br>    Defendant. | Case No. 12-cv-07472-SJO-E<br><br>**PLAINTIFF'S OPPOSITION TO THE COCA-COLA COMPANY'S MOTION TO COMPEL ARBITRATION AND DISMISS THE COMPLAINT**<br><br>Date: December 10, 2012<br>Time: 10:00 a.m.<br>Courtroom: 1<br><br>Hon. S. James Otero<br><br>Action Filed: August 30, 2010 |

# TABLE OF CONTENTS

**INTRODUCTION** ................................................................ 1

**STATEMENT OF FACTS** ..................................................... 1

*Missaghi's Allegations Against Coca-Cola* ............................ 1

*Coca-Cola's Motion To Compel* ......................................... 2

**ARGUMENT** ....................................................................... 3

**I.     As a Threshold Matter, Coca-Cola Has Failed To Show That It Has An Agreement With Missaghi To Arbitrate Her TCPA Claim.** ........................................................................ 3

**A.     The November 17, 2009 and January 1, 2011 Versions of the Program Rules Expired Before Defendant Transmitted the Spam Text Messages to Missaghi's Cellular Phone.** ........................................................ 4

**B.     The November 17, 2009 and January 1, 2011 Versions of the Program Rules Were Superseded by the January 1, 2012 Version.** ...................................... 4

**C.     The Evidence Shows That Missaghi Never Agreed to the January 1, 2012 Version of the Program Rules.** ............ 5

**II.    Missaghi's TCPA Claim Against Coca-Cola Does Not Arise From The Loyalty Program Rules.** ....................................... 6

**A.     Missaghi's TCPA Claim Does Not Arise From the Loyalty Program Rules.** ........................................... 7

**B.     The My Coke Rewards Mobile Terms and Conditions—Not the Loyalty Program Rules—Likely Govern Coca-Cola's Sending of Promotional Text Messages.** ................... 8

**C.     The Motion to Compel Still Fails Because Missaghi Affirmatively Opted Out of Receiving Text Messages From Coca-Cola.** ................................................. 10

**D.     At Least One of the Spam-Text Messages That Coca-**

Cola Sent to Missaghi Has Nothing to do With My Coke Rewards. ................................................................................. 11

III. **The Arbitration Provision Is Unenforceable Because It Is Illusory.** .......................................................................... 11

    A. **No Consumer Would Spend Tens of Thousands of Dollars to Recover a Nickel for Defendant's Violations of the TCPA.** ........................................................ 12

    B. **The AAA Would Not Accept an Arbitration Brought Under Coca-Cola's Arbitration Provision.** ....................... 13

    C. **The Arbitration Provision Provides Coca-Cola With the Unfettered Right to Alter its Terms.** ................................ 14

IV. **The Arbitration Clause Is Both Procedurally and Substantively Unconscionable.** ............................................ 16

    A. **The Arbitration Clause is Procedurally Unconscionable.** .. 16

    B. **The Arbitration Clause is Substantively Unconscionable.** .. 18

        1. *The Arbitration Provision Forces Plaintiff To Waive Her Substantive Statutory Rights Under The TCPA.* .. 18

        2. *The Arbitration Provision Is Cost Prohibitive.* ............ 19

**CONCLUSION** ................................................................................. 20

# TABLE OF AUTHORITIES

**UNITED STATES SUPREME COURT CASES:**

*AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740 (2011) ................................... 5

*AT&T Technologies, Inc. v. Communications Workers of Am.*,
    475 U.S. 643 (1986) ................................................................ 7

*Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*,
    473 U.S. 614 (1985) ................................................................ 19

**UNITED STATES CIRCUIT COURT OF APPEALS CASES:**

*Alday v. Raytheon Co.*, 2012 WL 3641649 (9th Cir. Aug. 27, 2012) ..................... 4

*Andersons, Inc. v. Horton Farms, Inc.*, 166 F.3d 308 (6th Cir. 1998) .................. 16

*Cape Flattery Ltd. v. Titan Mar., LLC*, 647 F.3d 914, 924 (9th Cir. 2011) ............ 7

*Lifescan, Inc. v. Premier Diabetic Servs., Inc.*, 363 F.3d 1010 (9th Cir. 2004) ....... 4

**UNITED STATES DISTRICT COURT CASES:**

*Ashbey v. Archstone Prop. Mgmt., Inc.*,
    2012 WL 1269122 (C.D. Cal. Apr. 13, 2012) ................................................. 3

*Eichinger v. Kelsey-Hayes Co.*, 2010 WL 2720931 (E.D. Mich. July 8, 2010) ..... 15

*Francis v. AT & T Mobility LLC*,
    07-CV-14921, 2009 WL 416063 (E.D. Mich. Feb. 18, 2009) ..................... 13

*High v. Capital Senior Living Properties 2-Heatherwood, Inc.*,
    594 F. Supp. 2d 789 (E.D. Mich. 2008) ........................................... 17 n.6

*HRL Land or Sea Yachts v. Travel Supreme, Inc.*,
    2009 WL 125845 (W.D. Mich. Jan. 16, 2009) ............................................ 18

*In re Jiffy Lube Int'l, Inc., Text Spam Litig.*,
    847 F. Supp. 2d 1253 (S.D. Cal. 2012) .................................................. 7, 11

*Lozada v. Dale Baker Oldsmobile, Inc.*,
    91 F. Supp. 2d 1087 (W.D. Mich. 2000) ................................................. 19

*Pichey v. Ameritech Interactive Media Srvcs, Inc.*,
　　421 F. Supp. 2d 1038, 1044-45 (W.D. Mich. 2006) .................................... 16

*Tobel v. AXA Equitable Live Ins. Co.*,
　　2012 WL 555801 (Mich. Ct. App. Feb. 21, 2012) ...................................... 12

*Whirlpool Corp. v. Grigoleit Co.*,
　　2011 WL 3879486 (W.D. Mich. Aug. 31, 2011) ........................................ 16

**STATE COURT CASES:**

*Carideo v. Dell, Inc.*, No., 2009 WL 3485933 (W.D. Wash. Oct. 26, 2009) ......... 15

*Chan v. Drexel Burnham Lambert, Inc.*,
　　178 Cal. App. 3d 632 (Ct. App. 1986) ......................................... 10

*Geneva-Roth, Capital, Inc. v. Edwards*, 956 N.E.2d 1195 (Ind. Ct. App. 2011) ... 15

*Morris v. Metriyakool*, 344 N.W.2d 736 (Mich. 1984) ......................................... 16

*Rembert v. Ryan's Family Steak Houses, Inc.*, 235 Mich. App. 118 (1999) .......... 19

*Zullo v. Superior Court,* 197 Cal. App. 4th 477 (Cal. Ct. App. 2011) ................... 17

**STATUTES:**

47 U.S.C. § 227 ........................................................................................................ 1

**MISCELLANEOUS:**

Black's Law Dictionary (7th ed. 2000) ........................................................... 5

21 Williston on Contracts § 57:31 (4th ed.) ......................................................... 7

1

## INTRODUCTION

2   This case involves Defendant The Coca-Cola Company's ("Coca-Cola")

3   practice of sending unauthorized text message spam to thousands of consumers

4   promoting its brand under the auspices of its "My Coke Rewards" program. As a

5   result, Missaghi brought suit under the Telephone Consumer Protection Act, 47

6   U.S.C. § 227, *et seq.* ("TCPA")—which prohibits the making of text message calls

7   to cell phones without prior express consent and, in order to deter the conduct and

8   compensate consumers—provides $500 in statutory damages per violation. Rather

9   than face the litigation, Coca-Cola has moved to compel arbitration.

10   Coca-Cola's Motion to Compel Arbitration fails for four independent

11   reasons. First, Coca-Cola has failed to demonstrate that a valid and enforceable

12   contract to arbitrate exists. Second, Missaghi's TCPA claim does not arise from—

13   and falls well outside of the scope of—the proffered agreement(s) containing the

14   arbitration provision at issue. Third, the arbitration provision is unenforceable

15   because it is illusory. Finally, the arbitration provision is unenforceable for the

16   related reason that it is unconscionable.

17

## STATEMENT OF FACTS

18   ***Missaghi's Allegations Against Coca-Cola***

19   The relevant facts giving rise to Missaghi's claim are not particularly

20   complex. Coca-Cola—the "largest beverage company in the world"[1]—sought to

21   increase revenue and brand awareness by sending unsolicited spam-text messages

22   to consumers. To effectuate the transmission of these text message calls, Coca-

23   Cola engaged Mobile Messaging Solutions, Inc. ("MMS"), a third party mobile

24   technology company, to distribute the spam-text messages to the unwitting

25   consumers who found themselves the target of Coca-Cola's mobile campaign.

26

27   [1]   *See* http://www.coca-colacompany.com/investors/company-fact-sheet (last accessed November 25, 2012).

Together, Coca-Cola and MMS utilized SMS short code "2653"[2] to send numerous spam-text messages to Missaghi and the putative class. (Compl. ¶ 16.)

Missaghi never consented to receive any text messages from Coca-Cola. (*See* Declaration of Shaghayegh Missaghi, which is filed contemporaneously herewith, ¶ 5-11.) Moreover, even though Missaghi tried repeatedly to opt out of receiving future text messages by texting the word "STOP" to the short code "2653," Coca-Cola ignored her and continued to text her anyway. (*Id.*)

### *Coca-Cola's Motion to Compel*

Coca-Cola filed its Motion to Compel on November 6, 2012. (Dkt. 18.) In it, Coca-Cola argues that Missaghi registered for the My Coke Rewards campaign on October 23, 2010, and thus, any and all disputes relating to the My Coke Rewards campaign are subject to the following arbitration provision found in the My Coke Rewards Loyalty Program Rules ("Loyalty Program Rules"):

> As a condition of participating in this Program, each Enrollee agrees that (1) any and all disputes, claims, and causes of action arising out of or connected with this Program . . . shall be resolved individually, without resort to any form of class action and exclusively by arbitration under the International Arbitration Rules of the American Arbitration Association. Arbitration will take place in Oakland County, Michigan; (2) any and all claims, judgments and rewards shall be limited to actual out-of-pocket costs incurred . . .but in no event attorneys' fees; and (3) under no circumstances will any Enrollee be permitted to seek recovery for . . . punitive, incidental and consequential damages and any other damages, other than for actual out-of-pocket expenses, and waives any and all rights to have damages multiplied or otherwise increased.

(Dkt. 18-3 at 37, §(I)(2).) As shown below, Missaghi is not subject to the Loyalty Program Rules or the arbitration provision contained therein.

---

[2] A "short code" is an abbreviated phone number used for sending text messages. Coca-Cola's licensed short code "2653" translates into "Coke."

1

**ARGUMENT**

2    The Court should deny Coca-Cola's motion because Coca-Cola has not

3  satisfied the FAA's two-part test to compel arbitration. A party seeking to compel

4  arbitration under the FAA has the burden to show: (1) the existence of a valid,

5  written agreement to arbitrate in a contract; and (2) that the agreement to arbitrate

6  encompasses the dispute at issue. *Ashbey v. Archstone Prop. Mgmt., Inc.*, 2012 WL

7  1269122, at *3 (C.D. Cal. Apr. 13, 2012). "Courts must place arbitration

8  agreements on an equal footing with other contracts." *AT&T Mobility LLC v.*

9  *Concepcion*, 131 S. Ct. 1740, 1745 (2011) (citations omitted).

10  **I.    As a Threshold Matter, Coca-Cola Has Failed To Show That it Has An**
        **Agreement With Missaghi to Arbitrate Her TCPA Claim.**

11

12    Coca-Cola argues that in October 2010, Missaghi joined a Coca-Cola loyalty

program and agreed to the Program Rules that supposedly govern the My Code

13
    Rewards campaign. (Def. Mot. at 1:2-3.) Coca-Cola further argues that the

14
    "arbitration agreement in the Program Rules broadly encompasses any disputes

15
    relating to My Coke Rewards, including this one." (*Id*. at 1:21-23.) In support of its

16
    Motion, Coca-Cola points to three (3) separate versions of the Program Rules

17
    (dated September 17, 2009, January 1, 2011, and January 1, 2012, respectively)

18
    that are presumably relevant. Tellingly, Coca-Cola declines to identify which of

19
    those three versions applies to Missaghi's claim and requires her to arbitrate.

20

21    There are three reasons why the proffered agreements are not enforceable

22  against Missaghi. First, the September 17, 2009 and January 1, 2011 versions of

23  the Program Rules expired by their own terms well before Missaghi received the

24  text messages that form the basis of her TCPA claim. Second, again by their own

25  terms, both contracts were superseded by later versions and, thus, are no longer

26  enforceable. Third, the evidence shows that Missaghi never agreed to—and

27  therefore, cannot be bound by—the January 1, 2012 version of the Program Rules.

As such, Coca-Cola has failed to show that a valid and enforceable contract exists that would require Missaghi to arbitrate her TCPA claim.

### A. The November 17, 2009 and January 1, 2011 Versions of The Program Rules Expired Before Defendant Transmitted the Spam Text Messages to Missaghi's Cell Phone.

It is well settled that "a court may not compel arbitration until it has first resolved whether a valid arbitration agreement exists." *Lifescan, Inc. v. Premier Diabetic Servs., Inc.*, 363 F.3d 1010, 1012 (9th Cir. 2004). Where the contract at issue has expired, the parties are released from their respective contractual obligations' and any dispute between them cannot be said to arise under the contract. *Alday v. Raytheon Co.*, 2012 WL 3641649, at *7 (9th Cir. Aug. 27, 2012).

The plain language of the November 17, 2009 and January 1, 2011 versions of the Program Rules—written completely by Coca-Cola—establish that they are fixed-term agreements that expired on December 31, 2010 and December 31, 2011, respectively. Indeed, under the heading "Duration of Program," the November 17, 2009 version states that "the current phase of the Program begins . . . on January 1, 2010 and is scheduled to end . . . on December 31, 2010." (*See* Dkt. 18-3 at 35, §(C)(1).) Likewise, the January 1, 2011 version states (under the same-titled heading) that "the current phase of the Program begins . . . on January 1, 2011 and is scheduled to end . . . on December 31, 2011." (*See* Dkt. 18-3 at 26, §(C)(1).) Given that these agreements expired on December 31, 2010 and December 31, 2011, respectively—i.e., before Missaghi's claim arose in 2012—they cannot be used to compel arbitration of her claim.

### B. The November 17, 2009 and January 1, 2011 Versions of The Program Rules Were Superseded by the January 1, 2012 Version.

Additionally, by their terms, each version of the Program Rules was superseded—and thereby rendered null and void—by each subsequent version. The "Modifications and Termination of Program" sections of both contracts state

that "the most current version of these Terms and Conditions will be available at the Website and will *supersede* all previous versions of these Terms and Conditions." (Dkt. 18-3 at 25, §(G)(3); 35, §(G)(3)) (emphasis added.) The term "supersede" is defined by BLACK'S LAW DICTIONARY as "to annul, make void, or repeal by taking the place of." BLACK'S LAW DICTIONARY, 1168 (7th ed. 2000). Hence, the November 17, 2009 version was superseded (and made void) by the January 1, 2011 version, which, in turn, was superseded (and made void) by the January 1, 2012 version. Hence, at the time Missaghi received the unlawful text messages that gave rise to her claim, the November 17, 2009 and January 1, 2011 contracts were no longer in existence.

### C. The Evidence Shows That Missaghi Never Agreed To The January 1, 2012 Version of The Program Rules.

Next, Coca-Cola has not produced any evidence to show that Missaghi accepted the terms of the January 1, 2012 version of the Program Rules. According to the plain language of the contract, the only way for Missaghi to have accepted the January 1, 2012 version of the Program Rules was through "continued participation" in the program:

> [a]n Enrollee's *continued participation* in the Program constitutes the Enrollee's acceptance of any changes to these Terms and Conditions.

(See Dkt. 18-3 at §(G)(3)) (emphasis added.) Coca-Cola has failed to proffer any evidence to demonstrate "continued participation," and thus, failed to meet its burden of showing that Missaghi accepted the 2012 version of the Program Rules.

To be sure, the documents produced by Coca-Cola in discovery undisputedly demonstrate that Missaghi has not participated in the Loyalty Program since October 22, 2011—more than two months before the January 1, 2012 version went into effect. (*See* Exhibit C to the Declaration of Ari J. Scharg, which is contemporaneously filed herewith.) In fact, on January 21, 2012, Coca-Cola

deducted 75 "points" from Missaghi's account, noting that they were "expired due to *inactivity*." (*Id*.) Because she didn't participate in the program after January 1, 2012, by its own terms, Missaghi could not and did not accept the January 1, 2012 version of the Program Rules. As such, Coca-Cola can't rely on that contract to argue Missaghi agreed to arbitrate.

## II.   Missaghi's TCPA Claim Against Coca-Cola Does Not Arise From The Loyalty Program Rules.

Even assuming, *arguendo*, that Missaghi did agree to the terms of the January 1, 2012 version of the Loyalty Program Rules, she would still not be required to arbitrate her TCPA claim because it does not arise from the Loyalty Program and, thus, is outside the scope of the arbitration clause. The arbitration clause provides that "any and all disputes, claims, and causes of action *arising out of or connected with this [Loyalty] Program*" shall be resolved by arbitration. (Dkt. 18-3 at §(I)(2).) Despite this limited scope, Coca-Cola argues that it broadly govern all aspects of the *My Coke Rewards* program, and, as such, that any dispute relating to *My Coke Rewards* in general is subject to arbitration.

This argument falls apart for at least four reasons. First, the scope of the Program Rules is narrowly defined and has nothing to do with the TCPA or the sending of promotional text messages. Second, the My Coke Rewards Mobile Terms and Conditions—which doesn't contain an arbitration provision—is likely what governs the sending of the promotional text messages at issue here. Third, Missaghi "exited" the program by texting "STOP" to Defendant's short code. Fourth, at least one of the unauthorized text messages at issue was sent completely out of the blue and has nothing to do with My Coke Rewards or the Loyalty Program.

### A.   Missaghi's TCPA Claim Does Not Arise From The Loyalty Program Rules.

---

1       Courts do not require arbitration of claims that arise independently of the

2  contract. *See AT&T Technologies, Inc. v. Comm'n Workers of Am.*, 475 U.S. 643,

3  648 (1986) (a party cannot be required to submit to arbitration any suit it has not

4  agreed to arbitrate). Even broad language in an arbitration agreement does not

5  make disputes unrelated to the contract arbitrable. For example, "when a tort claim

6  constitutes an 'independent wrong from any breach' of the contract it 'does not

7  require interpretation of the contract and is not arbitrable.'" *Cape Flattery Ltd. v.*

8  *Titan Mar., LLC*, 647 F.3d 914, 924 (9th Cir. 2011) (collecting authorities). "A tort

9  claim is not arbitrable just because it would not have arisen 'but for' the parties'

10  agreement." *Id*. Instead, the "test for whether a tort claim 'relates to' a contract

11  depends on whether the claim could be maintained without reference to the

12  contract." 21 WILLISTON ON CONTRACTS § 57:31 (4th ed.).

13       The recent opinion in *In re Jiffy Lube Int'l, Inc., Text Spam Litig.*, 847 F.

14  Supp. 2d 1253 (S.D. Cal. 2012) is instructive on this issue. There, the plaintiffs

15  filed a class action suit alleging that they received unauthorized text messages

16  offering discount Jiffy Lube services in violation of the TCPA. *Id*. at 1255–56. The

17  arbitration agreement at issue appeared on an invoice for an oil change that was

18  allegedly signed by a plaintiff when he visited one of the defendant's store

19  locations. *Id*. at 1262–63. The district court denied the defendant's motion to

20  compel arbitration, reasoning that the language of the arbitration agreement was

21  "incredibly broad" because "[i]t purports to apply to 'any and all disputes' between

22  [the parties], and is not limited to disputes arising from or related to the transaction

23  or contract at issue." *Id*. at 1262. The court concluded that "a suit . . . regarding a

24  tort action arising from a completely separate incident could not be forced into

25  arbitration—such a clause would clearly be unconscionable." *Id*. at 1263.  While

26  "the existence of the original contract may have been the 'but for' cause of the

27

1  alleged TCPA violation . . . this alone is not necessarily enough to establish that
2  the claim arises out of or relates to the contract." *Id*.

3      In this case, Missaghi's TCPA claim arises independently of the My Coke
4  Rewards Loyalty Program Rules, the scope of which is defined as "a loyalty
5  program . . . through which individuals can collect points by purchasing and
6  entering codes from packages marked with 'My Coke Rewards' on caps, labeling
7  or other packaging of selected Coca-Cola Company brands. . . ." (Dkt. 18-3 at
8  §(A)(1).) The Loyalty Program, then, has nothing to do with the TCPA or the
9  sending of unauthorized (or even authorized) text messages. Nor does it contain
10  any reference to Coca-Cola contacting Missaghi for any reason whatsoever, let
11  alone provide that Missaghi consented to receive text messages from Coca-Cola.
12  As such, Missaghi's TCPA claim does not arise from the Program Rules.

13      Accordingly, because Missaghi could and did bring her TCPA claim without
14  reference to the Program Rules, her claim does not "relate to" the proffered
15  arbitration provision. Likewise, Missaghi's TCPA claim does not turn on an
16  interpretation of any clause in the Program Rules or on Coca-Cola's performance
17  under the Rules.

18  **B.   The My Coke Rewards Mobile Terms and Conditions—Not The**
       **Loyalty Program Rules—Likely Govern Coca-Cola's Sending of**
19       **Promotional Text Messages.**

20      Coca-Cola argues that Missaghi's claim "relates exclusively to [her]
21  membership in My Coke Rewards and Coca-Cola's conduct related to My Coke
22  Rewards" and, as such, must be arbitrated pursuant to the Loyalty Program Rules.
23  (Def. Mot. at 8.) This argument is a non-starter because it pretends as though the
24  Program Rules (which contain the arbitration clause at issue) is the only relevant
25  contract in existence that applies to each and every dispute that relates in any way
26
27

to the My Coke Rewards program.[3] It is not—the Loyalty Program is just one of many programs under the My Coke Rewards umbrella, and each individual program—such as, the "My Coke Rewards Instant Win Game," the "My Coke Rewards Sweepstakes," and, most relevant to this case, the "My Coke Rewards Mobile News Flash"—is governed by its own separate and independent terms and conditions of use.[4] In this instance, it appears the terms connected with the My Coke Rewards Mobile Newsflash program, which don't contain an arbitration provision, are the terms that cover the sending of text messages.

Indeed, the "My Coke Rewards Mobile News Flash" program appears most relevant to Missaghi's TCPA claim. The terms and conditions of that program ("Mobile Terms")—which can be accessed through a hyperlink directly underneath the "Mobile Number" field on the My Coke Rewards registration page (*see* Def. Mot., Ex. 1)—are the only terms that speak to the sending of promotional text messages to consumer cell phones, and states:

> Participants who opt-in by text messaging will be automatically subscribed to receive periodical text message updates from the My

---

[3]   Coca-Cola even goes so far as to re-write the arbitration clause contained in the Loyalty Program Rules to require that "any and all disputes . . . arising out of or connected with ***My Coke Rewards*** must be resolved . . . by arbitration." (Def. Mot. at 8:19-21) (emphasis added). In reality, the arbitration clause only applies to disputes relating to the Loyalty Program Rules (i.e., "this Program"). Coca-Cola's attempted re-write of the arbitration clause highlights the desperation of its argument.

[4]   For example, a separate contract governs the "My Coke Rewards Instant Win Games," and notably, it does not contain an arbitration clause:

> any and all disputes, claims and causes of action arising out of or connected with *this Game* or any prizes awarded shall be resolved individually, without resort to any form of class action, and exclusively by the United States District Court for the Eastern District of Michigan (Southern Division) or the appropriate Michigan State Court located in Oakland County, Michigan.

(*See* Exhibit E to the Scharg Decl.) In other words, the Loyalty Program Rules is not a "one size fits all" contract that applies to every dispute between Coca-Cola and the My Coke Rewards members.

---

Coke Rewards program (up to 9 messages per month depending upon the subscriptions chosen). Participants may exit the program at any time by sending the word **STOP to the short code 2653**.

(*See* Exhibit D to the Scharg Decl.) (emphasis in original). Notably, the Mobile Terms explain how to opt out of the Mobile News Flash program (i.e., "by sending the word STOP to the short code 2653"), and thus bear directly on Missaghi's claim that she continued to receive unauthorized text messages even after sending the word "STOP" to short code 2653 several times. (Missaghi Decl. ¶¶ 5-11.)

Coca-Cola's Motion to Compel completely ignores the Mobile Terms, and understandably so—that agreement is separate and distinct from the Loyalty Program Rules, plainly relates to the spam-text messages that form the basis of Missaghi's claim and, most importantly, *does not contain an arbitration provision*. Further, neither the Mobile News Flash program nor the Mobile Terms are mentioned in the Loyalty Program Rules, let alone incorporated. *See Chan v. Drexel Burnham Lambert, Inc*., 178 Cal. App. 3d 632, 645 (Ct. App. 1986) (to incorporate a document, "the reference must be clear and unequivocal").

Accordingly, Missaghi's TCPA claim likely arises under the Mobile Terms; not the Loyalty Program Rules. Since there is no arbitration clause in the Mobile Terms, Missaghi is not required to arbitrate her claim,

### C.   The Motion To Compel Still Fails Because Missaghi Affirmatively Opted Out of Receiving Text Messages From Coca-Cola.

Even if Coca-Cola was correct that Missaghi accepted the January 1, 2012 Program Rules (it isn't), and that those Rules apply to unauthorized text messages (they don't), Plaintiff would still not be bound by the arbitration provision since she had already exited the Program by the time Coca-Cola transmitted the unauthorized text messages at issue. Coca-Cola's Mobile Terms state "You may exit the program at any time by sending the word STOP to the short code 2653." (Def. Mot., Ex. 1.) This is precisely what Plaintiff did in early 2012—after

receiving numerous unauthorized text messages, Missaghi texted "STOP" to "2653." (Missaghi Decl. ¶¶ 5-11.) Coca-Cola then sent Missaghi several spam-text text messages well after she exited the program. (*Id.*) Because her claim arose after she exited the program, Missaghi can't be compelled to arbitrate under the Program Rules. *See In re Jiffy Lube Int'l, Inc., Text Spam Litig.*, 847 F. Supp. 2d 1253 at 1263.

### D.    At Least One Of the Spam-Text Messages That Coca-Cola Sent to Missaghi Has Nothing To Do With My Coke Rewards.

Finally, even if the arbitration clause contained in the Loyalty Program Rules did broadly apply to all disputes related to My Coke Rewards (it doesn't), Coca-Cola's Motion to Compel should still be denied because at least one of the spam-text messages sent to Missaghi had nothing to the with the My Coke Rewards program. Specifically, in July 2012, Coca-Cola sent Missaghi an unauthorized text message urging her to "go to www.coca-cola.com/theolympics Txt STOP to stop." (Missaghi Decl. ¶ 7.) That website—which is titled "Move to the Beat of London 2012"—seems to only provide video and commentary of the 2012 Olympics, and makes no reference whatsoever to "My Coke Rewards." As such, Coca-Cola has no right to seek arbitration of Missaghi's TCPA claim.

## III.    The Arbitration Provision Is Unenforceable Because It Is Illusory.

Even in the aftermath of the Supreme Court's decision in *AT&T v. Concepcion,* the enforceability of an arbitration clause is still subject to basic contract defenses that may be used to invalidate such a provision. 131 S.Ct. at 1746. As such, federal courts apply state law to determine whether contract defenses may invalidate arbitration agreements. S*mith v. ComputerTraining.com Inc.*, 772 F. Supp. 2d 850, 855 (E.D. Mich. 2011). Thus, generally applicable state-law contract defenses like fraud, forgery, duress, mistake, lack of consideration or mutual obligation, or unconscionability, may invalidate the arbitration agreement

at issue. *Cooper v. MRM Inv. Co*., 367 F.3d 493, 498 (6th Cir. 2004).

Assuming, *arguendo*, that Coca-Cola could show that Missaghi accepted the January 1, 2012 version of the Loyalty Program Rules (it can't), Coca-Cola's Motion to Compel should still be denied because the arbitration clause at issue is illusory. An "illusory contract" is defined as "an agreement in which one party gives as consideration a promise that is so insubstantial as to impose no obligation. The insubstantial promise renders the agreement unenforceable." *Tobel v. AXA Equitable Live Ins. Co*., 298129, 2012 WL 555801, at *4 (Mich. Ct. App. Feb. 21, 2012). There are three reasons why Coca-Cola's arbitration provision is illusory.

First, no consumer would ever spend tens of thousands of dollars to initiate an arbitration to recover a nickel—which is the effect that Coca-Cola's arbitration clause would have on consumers. Second, the American Arbitration Association ("AAA"), which is identified in Coca-Cola's arbitration clause as the exclusive arbitral forum, simply would not accept arbitrations brought pursuant to Coca-Cola's arbitration clause. Third, Coca-Cola has retained the unfettered right to alter the terms of the arbitration clause.

### A.   No Consumer Would Spend Tens of Thousands of Dollars to Recover a Nickel for Defendant's Violation of the TCPA.

The arbitration provision at issue essentially contracts away consumer rights under the TCPA by limiting any recovery in arbitration to "out of pocket" damages (and excluding relief like statutory damages, injunctive, and equitable remedies).

Pursuant to the AAA's International Arbitration Rules ("International Rules"), which are supposedly applicable here, Missaghi would be required to front an initial filing fee of $3,350 (the fee for nonmonetary claims (i.e., an injunction), given that the arbitration provision prohibits statutory damages) in addition to a $1,250 "final fee." (International Rules at 42.) Plaintiff would also have to cover the costs of travel to Michigan for the arbitration along with any

costs incurred with researching her claims and preparing the written notice of arbitration that must be filed by the claimant (International Rules, Article 2), to say nothing of the costs attendant with retaining counsel.

Moreover, the International Arbitration Rules also allows Coca-Cola to seek attorneys' fees and costs from consumers if it prevails.[5] Combined with substantial up-front costs, the threat of a consumer having to pay (without limitation) Coca-Cola's attorneys' fees immunizes it from suit. Worse still, Plaintiff would have no reasonable means to seek legal counsel for the arbitration or to prepare the written notice of arbitration because Coca-Cola's arbitration clause specifically waives her ability to recover attorneys' fees.

In sum, Coca Cola has fashioned its arbitration clause such that (a) only the AAA can arbitrate the dispute, (b) by its own rules, the AAA is prohibited from accepting the arbitration, (c) the consumer must pay $3,000 to initiate the arbitration and spend thousands more travel to Michigan to attend the arbitration, (d) if the consumer loses, he may be responsible for tens of thousands of dollars more in defense costs, and (e) he must forgo all statutory damages guaranteed by Congress, any right to injunctive relief and any right to attorneys' fees, and can recover no more than the nickel in out of pocket damages suffered. In short, Coca Cola's arbitration clause is no more meaningful than if it told consumers it could sue them, so long as all hearings took place on the moon.

The clause as written is illusory and thus unenforceable. *See Francis*, 2009 WL 416063 (recognizing arbitration clause is unenforceable if it waives statutory

---

[5]     Under the International Rules, the tribunal has the right to apportion costs among the parties, including: (1) fees and expenses of arbitrators, (2) the costs of assistance required by the tribunal, including its experts, (3) the fees and expenses of the administrator, and (4) the reasonable costs for legal representation of a successful party. (International Rules, Article 31.) Plaintiff may also be required to deposit amounts to advance costs associated with categories 1, 2, and 3, above. (International Rules, Article 33.)

rights and process is so unfair that litigant cannot effectively enforce his statutory rights").

### B.   The AAA Would Not Accept an Arbitration Brought Under Coca-Cola's Arbitration Provision.

Next, the AAA would not accept arbitrations brought pursuant to Coca-Cola's arbitration clause—which incorporates the AAA's International Rules—because it violates due process. According to the AAA, "All parties are entitled to a fundamentally-fair ADR process. As embodiments of fundamental fairness, [the AAA's Consumer Due Process Protocol] Principles should be observed in structuring ADR Programs." (*See* AAA Consumer Due Process Protocol, at 4-7, attached as Exhibit G to the Scharg Decl..) Coca-Cola's arbitration provision falls woefully short of the AAA's Consumer Due Process Protocol Principles.

In particular, Coca-Cola's arbitration clause runs afoul of the AAA's Protocol in that it (i) does not provide sufficient information regarding the arbitral process, failing to even indicate where the applicable rules may be obtained (Principle 1 – Access to Information), (ii) does not inform consumers of their right to proceed in small claims court (Principle 5 – small claims), (iii) requires that consumers pay all arbitration fees (which, under the International Rules, is $5,000 or more), regardless of the size of their claims (Principle 6 – Reasonable Cost), and (iv) requires that consumers travel to Michigan to arbitrate, regardless of where they are located or where the cause of action arose (Principle 7 – Reasonable Location).

Here, there should be no question that the selection of the AAA as the exclusive arbitral forum is integral to the parties' agreement. Indeed, it would defy logic to determine that the parties are bound "exclusively and finally" to the rules of the AAA, and at the same time that the forum which promulgated and is best-suited to apply them—the AAA itself—was not integral to the agreement. Courts

throughout the country are in agreement. *See Geneva-Roth, Capital, Inc. v. Edwards*, 956 N.E.2d 1195 (Ind. Ct. App. 2011) (concluding that the selection of the NAF was integral to the arbitration agreement, was no longer available, and therefore, the arbitration provision was null and void on grounds of impossibility); *Carideo v. Dell, Inc*., No., 2009 WL 3485933, at *6 (W.D. Wash. Oct. 26, 2009) (same). Because the language of the clause contemplates the AAA would be the exclusive forum for any arbitration, but is unavailable in this instance, the arbitration provision can't be enforced because it's illusory.

### C.     The Arbitration Provision Provides Coca-Cola With the Unfettered Right to Alter its Terms.

The Program Rules expressly state that Coca-Cola "reserves the right to modify any of the Terms and Conditions set forth herein . . . at any time, with notice." (Dkt 18-3 at 26, §(G)(1).) According to the agreement, however, notice is accomplished by posting the new terms to the website. (*Id*. at §(G)(3).) This places an unreasonable onus on consumers and allows Coca-Cola to modify its arbitration provision at will, without providing any meaningful notice. *See Douglas v. U.S. Dist. Court for Cent. Dist. of California*, 495 F.3d 1062, 1066 (9th Cir. 2007) ("Parties to a [online] contract have no obligation to check the terms on a periodic basis to learn whether they have been changed by the other side.")

Most federal courts that have considered this issue have held that if a party retains the unilateral, unrestricted right to terminate the arbitration agreement, it is illusory and unenforceable, especially where there is no obligation to receive consent from, or even notify, the other parties to the contract. *See, e.g.*, *Eichinger v. Kelsey-Hayes Co.*, 2010 WL 2720931, at *7 (E.D. Mich. July 8, 2010) ("An arbitration agreement allowing one party the unfettered right to alter the arbitration agreement's existence is illusory"); *Douglas v. Johnson Real Estate Investors, LLC*, 470 F.App'x 823, 825 (11th Cir.2012) ("Because the employee handbook

allowed Johnson to unilaterally modify the arbitration procedures, the agreement to arbitrate was illusory and invalid").

Because Coca-Cola has retained the unfettered right to modify or alter the arbitration provision, the Program Rules are illusory in this regard as well.

## IV.   The Arbitration Clause Is Both Procedurally and Substantively Unconscionable.

Like other contracts, an arbitration provision is invalid if it is both procedurally and substantively unconscionable. *Pichey v. Ameritech Interactive Media Srvcs, Inc.*, 421 F. Supp. 2d 1038, 1044-45 (W.D. Mich. 2006). *See Kanbar v. O'Melveny & Myers,* 849 F. Supp. 2d 902, 909 (N.D. Cal. 2011) (even after *Concepcion*, unconscionability remains a basic contract defense that may be used to invalidate arbitration provisions). Here, the proffered arbitration clause is both procedurally and substantively unconscionable and, therefore, unenforceable.

### A.   The Arbitration Provision is Procedurally Unconscionable.

Under Michigan law, procedural unconscionability exists "when the weaker party to an agreement has little or no bargaining power and no realistic alternative but to accept the terms of the agreement." *Whirlpool Corp. v. Grigoleit Co.*, 2011 WL 3879486, at *3 (W.D. Mich. Aug. 31, 2011); *See Morris v. Metriyakool*, 344 N.W.2d 736, 742 (Mich. 1984) ("Contracts of adhesion are characterized by standardized forms prepared by one party which are offered for rejection or acceptance without opportunity for bargaining and under the circumstances that the second party cannot obtain the desired product or service except by acquiescing in the form agreement."). The Sixth Circuit has noted that "the most important factors in determining procedural unconscionability are (1) whether the relatively weaker party had an alternative source with which it could contract, and (2) whether the contract term in question was in fact negotiable." *Andersons, Inc. v. Horton Farms, Inc.*, 166 F.3d 308, 324 (6th Cir. 1998).

1    Here, Coca-Cola's arbitration clause is procedurally unconscionable because

2    Missaghi had no opportunity to bargain or negotiate the provision's terms, which

3    were contained in an online, standardized form contract, and were offered strictly

4    on a take-it-or-leave-it basis. Coca-Cola—the largest beverage company in the

5    world—as the drafter of the Loyalty Program Rules, enjoyed a substantially

6    superior bargaining position relative to Missaghi and other consumers. Indeed, the

7    terms indicate that by "clicking 'I Agree' . . . you agree to the following rules."

8    (Dkt. 18-3, at 1.) This language allows no room for compromise. Moreover,

9    because the Loyalty Program is sponsored by Coca-Cola and provides rewards for

10   Coca-Cola products, there was no alternative program that Missaghi could have

11   joined to receive the same benefits. Under the circumstances, there is no question

12   that Coca-Cola's bargaining power far exceeds that of Missaghi, or that the

13   Loyalty Program Rules is a contract of adhesion.[6]

14   There is an additional reason why the arbitration provision should be found

15   procedurally unconscionable—it is unclear which arbitration rules apply. *See, e.g.,*

16   *Trivedi v. Curexo Technology Corp.*, 189 Cal. App. 4th 387, 393 n. 4 (2010) (the

17   failure to provide arbitration rules is procedurally unconscionable); *Zullo v.*

18   *Superior Court,* 197 Cal.App.4th 477, 485 (Cal. Ct. App. 2011) ("The absence of

19   the AAA arbitration rules adds a bit to the procedural unconscionability"). While

20   Coca-Cola's arbitration provision indicates that the "International Arbitration

21   Rules of the American Arbitration Association" apply (Dkt. 18-3, §(I)(2)), no such

22   document or set of rules exists with that name. Rather, it appears from the

23   documents produced by Coca-Cola during discovery that such rules can only be

---

[6]    Further, the text of the arbitration provision, which is small and buried on the last page of the Program Rules, adds to its unconscionability, *See High v. Capital Senior Living Properties 2-Heatherwood, Inc.*, 594 F. Supp. 2d 789, 799 (E.D. Mich. 2008) ("Procedural unconscionability is present where the challenged provision is buried in the text of a document, appears in small font, or is not otherwise conspicuous.").

found within a separate document entitled "International Dispute Resolution Procedures." (*See* Exhibit F to the Scharg Decl.)

To confuse things even further, Coca-Cola fails to provide a copy of such rules—or even a link to them—to consumers when they register for the Loyalty Program. As a result, consumers are not informed that the International Rules would require them to pay an initial filing fee of $3,350, plus a $1,250 "final fee," plus the arbitrators' fee, plus, if Coca-Cola were to prevail, its attorneys' fees and costs. Coca-Cola's failure to disclose the applicable rules or fee schedule in the agreement smacks of procedural unconscionability.

## B.   The Arbitration Clause Is Substantively Unconscionable.

Substantive unconscionability arises when the terms of the provision are "not substantively reasonable." *Whirlpool*, 2011 WL 3879486, at *3. The commercial setting, purpose, and effect of the contractual provision determines whether that provision is substantively unreasonable or unconscionable. *Id.* "A term is substantively unreasonable when the inequity of the term is so extreme as to shock the conscience." *HRL Land or Sea Yachts v. Travel Supreme, Inc.*, No. 1:07-cv-945, 2009 WL 125845, at *7 (W.D. Mich. Jan. 16, 2009).

Here, the arbitration provision is substantively unconscionable because it requires Missaghi to waive her right to seek remedies under the TCPA and imposes outrageous fees and costs to arbitrate her claim; not to mention that, as discussed above, it fails to comply with the AAA's Consumer Due Process Protocols, and grants Coca-Cola with the power to unilaterally alter its terms on a whim.

### 1.   *The Arbitration Provision Forces Plaintiff To Waive Her Substantive Statutory Rights Under The TCPA.*

The arbitration clause is unconscionable because it forces Plaintiff to waive her right to seek actual, statutory, and treble damages under the TCPA, and states:

(2) any and all claims, judgments and rewards shall be ***limited to***

1   actual out-of-pocket costs incurred . . . but in no event attorneys' fees;
2   and (3) under no circumstances will any Enrollee be permitted to seek
    recovery for, and Enrollee hereby **waives all rights** to claim, punitive,
    incidental and consequential damages and any other damages . . . and
3   waives any and all rights to have damages multiplied or otherwise
    increased.

4   (§(I)(2)) (emphasis added.) This provision is unconscionable as it precludes

5   consumers from recovering any statutorily-entitled relief from Coca-Cola, and

6   therefore, insulates it from liability under every statute, including the TCPA.

7       By agreeing to arbitrate a statutory claim, a party does not forgo the

8   substantive rights afforded by the statute; it only submits to their resolution in an

9   arbitral, rather than a judicial forum." *Mitsubishi Motors Corp. v. Soler Chrysler–*

10  *Plymouth, Inc.,* 473 U.S. 614, 628 (1985). As Coca-Cola's own authority explains,

11  "federal and other state courts have held that these agreements are enforceable,

12  provided that the arbitration procedures are fair and the agreement waives no

13  *substantive rights and remedies. Rembert v. Ryan's Family Steak Houses, Inc.*, 235

14  Mich. App. 118, 123 (1999) (emphasis added). Indeed, Michigan courts have

15  recognized that an arbitration clause is unconscionable when it forces plaintiffs to

16  waive their right to seek remedies provided by statute. *See Lozada v. Dale Baker*

17  *Oldsmobile, Inc*., 91 F. Supp. 2d 1087, 1105 (W.D. Mich. 2000) (substantive

18  unconscionability where arbitration clause waived statutory right to declaratory

19  and injunctive relief, as it "fails to meet the test of reasonableness" where it fails to

20  "confer on the arbitrator the authority to provide" statutory remedies).

21      Here, the arbitration provision at issue precludes Missaghi from recovering

22  statutory relief, including statutory damages, injunctive relief, and attorneys' fees

23  by limiting Missaghi's available relief to "actual out-of-pocket costs incurred" and

24  precluding the recovery of "punitive, incidental and consequential damages and

25  any other damages." (§(I)(2).) Hence, the arbitration clause is unconscionable

26  because it forces Plaintiff to waive the remedies provided by the TCPA.

27

## 2. *The Arbitration Provision Is Cost Prohibitive.*

Second, as discussed above under §III.B, arbitration under the provision is cost prohibitive such that no reasonable consumer (or attorney) would initiate one against Coca-Cola. The International Rules—to the extent even incorporated into the arbitration provision—impose outrageous costs on Missaghi and, given that none of the Loyalty Program members reside outside of the country, can only be meant to discourage consumers from initiating arbitrations.[7]

Given that consumers are required to pay almost $5,000 in filing fees and may also be responsible for the (1) fees and expenses of arbitrators, (2) costs of assistance required by the tribunal, including its experts, (3) fees and expenses of the administrator, and (4) Coca-Cola's attorneys' fees (International Rules, Article 31), Coca-Cola's arbitration provision imposes outrageous burdens and costs on consumers, and "shocks the conscience" so as to render it unconscionable.[8]

## CONCLUSION

For the foregoing reasons, Plaintiff Shaghayegh Missaghi, individually and on behalf of all others similarly situated, respectfully requests that the Court enter an Order (i) denying Coca-Cola's Motion to Compel Arbitration in its entirety, and (ii) for any further relief as the Court deems equitable and just.

---

[7] Unlike AT&T's arbitration agreement that was blessed by the Supreme Court in *Concepcion*, Coca-Cola's arbitration clause does not: (1) allow consumers to initiate arbitrations online, (2) offer to pay any costs of arbitration, (3) offer to proceed with the arbitration in a convenient forum, (4) allow arbitration by phone, in person, or on the papers, (5) allow consumers to bring a small claims suit, (6) permit arbitrators to issue individual injunctions and punitive damages, (7) disclaim the right to seek reimbursement of its attorneys' fees, (8) offer to pay a premium in the event the award beat the Defendant's last settlement offer; or (9) offer to reimburse consumers for their attorneys' fees.

[8] Coca-Cola refused to provide any information in discovery on the (i) number of disputes submitted to arbitration by Coca-Cola and the outcomes, (ii) number of disputes submitted by Loyalty Program members and the outcomes, (iii) amount of monies paid or refunded pursuant to such arbitration proceedings, and (iv) number of times that Coca-Cola moved to compel under the International Rules. Coca-Cola's refusal to produce the requested statistics can only mean that they support Missaghi's position that the arbitration provision is one-sided and produces harsh results.

---

Respectfully submitted,

Dated: November 26, 2012

**SHAGHAYEGH MISSAGHI**, and
on behalf of a class of similarly situated
individuals

By: /s/ Sean Reis
One of Plaintiff's Attorneys

Sean P. Reis (SBN 184044)
(sreis@edelson.com)
EDELSON MCGUIRE, LLP
30021 Tomas Street, Suite 300
Rancho Santa Margarita, California 92688
Telephone: (949) 459-2124
Facsimile: (949) 459-2123

PLAINTIFF'S OPPOSITION TO
MOTION TO COMPEL ARBITRATION

CASE NO. 12-CV-07472-SJO-E